IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| COLLEEN S. WELLER, | ) | Case No. 10 C 50164 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Magistrate Judge P. Michael Mahoney |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.    Introduction**

Colleen S. Weller ("Claimant") seeks judicial review of the Social Security

Administration Commissioner's decision to deny her claim for Disability Insurance

Benefits ("DIB"), under Title II of the Social Security Act. *See* 42 U.S.C. § 405(g). This

matter is before the Magistrate Judge pursuant to the consent of both parties, filed on

June 30, 2010. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

**II.    Administrative Proceedings**

On January 3, 2006, Claimant applied for Disability Insurance Benefits, alleging a

disability onset date of June 30, 2003. (Tr. 84.) Claimant's initial application was denied

on March 14, 2006. (Tr. 84.) Her claim was denied a second time upon reconsideration

on May 30, 2006. (Tr. 84.) Claimant then filed a timely request for a hearing before an

Administrative Law Judge ("ALJ") on June 8, 2006. (Tr. 84.) The hearing took place on

April 30, 2007, via video teleconference between Evanston, Illinois and Rockford,

Illinois, before ALJ Daniel Dadabo. (Tr. 84.) Claimant appeared and testified in Rockford

1

with her attorney present. (Tr. 84.) Vocational expert ("VE"), James Radke, also testified before the ALJ. (Tr. 84.) The hearing was continued in order to obtain additional medical evidence and to retain the services of a medical expert. (Tr. 84.)

A supplemental hearing took place on July 23, 2007, via video teleconference between Evanston, Illinois and Rockford, Illinois, before ALJ Daniel Dadabo. (Tr. 84.) Claimant appeared and testified in Rockford with her attorney present. (Tr. 84.) ME Ellen Rozenfeld, Psy.D., and VE, William Newman, also testified before the ALJ. (Tr. 84.)

On October 23, 2007, the ALJ held that Claimant was not disabled and denied her claim for DIB. (Tr. 95.) The ALJ's decision is considered the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1455, 416.1481. Claimant now files a complaint in this Federal District Court, seeking judicial review under 42 U.S.C. § 405(g).

**III.** **Background**

Claimant was born on April 12, 1970, and was thirty-seven years old at the time of the supplemental hearing. (Tr. 42.) Claimant stood five feet and six inches tall, and weighed approximately 335 pounds when she appeared in front of the ALJ. (Tr. 14.) At the time of the hearing, Claimant resided in Rockford, Illinois with her husband and son. (Tr. 42-43, 335.) Claimant completed high school and took a course at Rock Valley College. (Tr. 43.)

Claimant's main previous work was as a CNA. (Tr. 48.) The VE present at the hearing which took place on April 30, 2007, reported the CNA job as a medium semiskilled profession. (Tr. 69.) Claimant more recently worked as a caregiver for an

elderly Alzheimer's patient approximately six hours per week, but the ALJ determined that this did not constitute past relevant work. (Tr. 42, 70.)

At the hearing which took place on April 30, 2007, Claimant testified that she could dust and do dishes if she had to, but most of the time her son would do them. (Tr. 53.) She also stated that she could not vacuum or do the laundry and her husband does the family shopping. (Tr. 49, 53.) Claimant testified that she spends the average day making sure her son is ready for school, taking him to the bus or driving him to school, reading, laying down, making phone calls, and taking care of things around the house. (Tr. 51.) When Claimant takes her son to school, it is a 20 minute drive both directions. (Tr. 53.) Claimant stated that she likes to read newspapers, autobiographies, and the bible. (Tr. 52.) When questioned about the people with whom she speaks on the phone, Claimant stated that she had a lot of friends to talk to, most of whom she has known for a long time. (Tr. 52-53.)

The VE in the initial hearing was given the following hypothetical:

> "…a person able to stand and walk two hours out of eight. Lift and carry up to 10 pounds, that would be occasionally. We'll say five pounds frequently. The rest of the time they're able to sit six hours out of eight. We probably want to have level work surfaces. Let's say that I'm talking about unskilled jobs that are routine and repetitive. Do not require judgment and – there's no extended communication with other workers. In other words, you might pass them in the hallway but you're not going to have to speak with them for very long."

(Tr. 70-71.)

When asked if such a person would be able to return to her past relevant work, the VE said she could not. (Tr. 71.) The VE testified that there was work that such a Claimant could perform including general office clerk, bookkeeping clerk, order clerk,

courier, and machine operator. (Tr. 71-73.) The VE indicated that nine days of absenteeism per year would be tolerated. (Tr. 74.) However, four to twelve hours off task per month on an unscheduled basis would not be consistent with competitive employment, and the Claimant would not be allowed to lie down on the job. (Tr. 74-75.) The VE also stated that a person going through emotional lows where she may not relate appropriately to her supervisor or coworkers on a recurring basis would not be accommodated. (Tr. 75.) He further stated that the order clerk and accounting clerk positions would require extended periods of sitting. (Tr. 76.)

At the Supplementary hearing which took place on July 23, 2007, the ME testified that the Claimant would be able to tolerate customary work pressures eight hours a day, five days a week in some restricted setting where she would not have to have ongoing interaction with other people. (Tr. 23.) The ME further testified that the Claimant is able to withstand the pressures of simple and routine work related activities, and the file evidence would suggest to him that she should be able to perform operations of a simple routine nature on a sustained basis. (Tr. 24, 27.) When asked if the Claimant is likely to have brief episodes of decompensation where she might have to miss work one or twice a month, the ME responded that he could not say but given her subjective sense of the symptoms and how she has reported things it is a possibility. (Tr. 28.)

The VE at the Supplemental hearing was given the following hypothetical:

> "Assume a younger person with a [high school] education, this work background, this skill set…And I said assume this person is basically limited to sedentary work on level work surfaces. And when I say sedentary work,…, I'm talking about standing and walking two hours out of eight, sitting six hours out of eight. Lifting and carrying no more than 10 pounds occasionally, five pounds frequently. I had said that the individual from the health standpoint of mental

4

> functioning probably had to have unskilled tasks of a
> routine and repetitive nature that did not involve judgment,
> interaction with other workers, public contact. And when I
> say no interaction with other workers I'm talking about
> extended oral or written communication."

(Tr. 30-31.)

The VE was then asked if there were any unskilled jobs which the Claimant could perform. (Tr. 31.) The VE stated that jobs were available including sorter and bench assembler. (Tr. 32.) There would not be any erosion of these jobs if the individual had to use a cane for balance. (Tr. 32.) The VE further testified that generally a person may not be absent more than one day per month or twelve days per year. (Tr. 32.) If a person were to be absent at least eight times a month it would totally erode the availability of the position. (Tr. 32.) These positions would generally not be able to support someone who would have to leave the work station for 30 to 60 minutes at a time. (Tr. 33.) Realistically only five to ten minute intervals of lost focus or concentration would be tolerated. (Tr. 33.) The VE further stated that one or two occasions of the individual going through emotional lows where she is not able to respond to supervisors appropriately or cooperate with coworkers could be tolerated, but if it is something that is repeated it would not be tolerated. (Tr. 34.)

IV.    **Medical History**

1.      **Bipolar Disorder, Social Anxiety, Depression, and OCD**

On July 1, 2003, Claimant underwent a 15 minute consultation regarding bipolar disorder. (Tr. 251.) Dr. Jeffrey S. Royce, M.D., noted that Claimant reported feeling more depressed, having low energy, and crying more. (Tr. 251.) Dr. Royce assessed the Claimant as having bipolar disorder with a depressed phase. (Tr. 251.) On a recheck of

her bipolar disorder on August 8, 2003, Dr. Royce noted that Claimant was not following any of the recommendations for her medical therapy. (Tr. 250.) He further noted that Claimant felt her moods were good and she wasn't depressed. (Tr. 250.)

On August 29, 2003, Dr. William J. Giakas, M.D., diagnosed Claimant with Social Anxiety Disorder and Major Depression Disorder, Recurrent, Severe. (Tr. 259.) During a follow-up on November 12, 2003, Claimant rated herself a 10/10 severity on most items of the PSQ self-rating scale, but Dr. Giakas noted her affect as friendly and personable. (Tr. 273.) He further noted that the Claimant had no plans of harming herself and yet she still rated herself a 10/10 on that dimension as well. (Tr. 273.)

At her next follow-up, on December 12, 2003, Claimant rated her level of depression at 9/10 severity, anxiety 9/10 severity, anergia 7/10 severity. (Tr. 272.) However, Dr. Giakas noted that her affect is not nearly as depressed as her self-rating seems to suggest. (Tr. 272.) On January 12, 2004, Dr. Giakas noted that the Claimant reported increased depression in the absence of any clear identifiable stressors. (Tr. 272.) Dr. Giakas further reported that she is not tearful and does not appear agitated, anxious, or distraught. (Tr. 272.)

On January 26, 2004, Claimant asked Dr. Giakas if he thought she would be able to receive disability. (Tr. 271.) He told Claimant that they had only met four times and have not had enough time to work on her problem. (Tr. 271.) Dr. Giakas also noted that Claimant admitted she felt better overall compared to her last visit. (Tr. 271.) Claimant had some intermittent thoughts of wishing she were dead but was not suicidal. (Tr. 271.) Claimant met with Dr. Giakas again on March 3, 2004. (Tr. 270.) He noted that Claimant's condition seemed to deteriorate since the last visit when he told her he would

6

not be able to support her disability claim. (Tr. 270.) Claimant stated that she had been irritable, depressed, and had had passive thoughts of wishing she were dead with no active plans. (Tr. 270.)

On May 10, 2004, Claimant again met with Dr. Giakas. (Tr. 269.) Claimant's mood was generally stable and euthymic and her affect is bright and reactive. (Tr. 269.) Dr. Giakas further noted that her mood disorder was under good control and diagnosed Claimant with Social Anxiety Disorder and Major Depressive Disorder, Recurrent, in partial remission. (Tr. 269.) On August 23, 2004, Dr. Giakas reported that Claimant's mood remains moderately depressed with an average 5/10 severity. (Tr. 267.)

On October 13, 2004, Dr. Giakas noted Claimant to be more depressed, anxious, and sometimes agitated since her mother died last month. (Tr. 266.) She was not suicidal and her affect was tearful but pleasant and cooperative. (Tr. 266.) On November 15, 2004, Dr. Giakas reported substantially similar results. (Tr. 266.) Upon follow-up, on December 28, 2004, Dr. Giakas stated that Claimant's mood had been very depressed but also stated that she rated herself on the PSQ as much more severely symptomatic than she appeared. (Tr. 265.)

On February 8, 2005, Claimant's mood was depressed and anxious. (Tr. 265.) Claimant rated every symptom a 10/10 severity and Dr. Giakas stated that she seemed to be exaggerating her symptomology. (Tr. 265.) When Dr. Giakas confronted her about the high rating she gave herself for suicidal ideation, she admitted that she felt like she wished she were dead "once in a while" but she had no active plans. (Tr. 265.)

Claimant met with Dr. Giakas again on March 15, 2005. (Tr. 264.) Dr. Giakas reported Claimant was still feeling anxious, but her affect was not as distraught, agitated,

or withdrawn as it had been. (Tr. 264.) Four subsequent evaluations produced substantially similar findings. (Tr. 261-63.) During a follow-up on October 26, 2005, Claimant stated that she was beginning to feel more relaxed and feel much better. (Tr. 261.) Her affect was much less distraught, she appeared calm, and her thinking was rational. (Tr. 261.)

On December 13, 2005, Dr. Giakas reported that Claimant had persisting anxiety, particularly in crowded public places. (Tr. 260.) The anxiety tended to create panic symptoms and she had unrealistic fears. (Tr. 260.) Her thoughts were goal-oriented, her memory was intact, and she was not suicidal. (Tr. 260.)

Upon referral, Dr. John L. Peggau, Psy.D., a psychological consultant, spent approximately 45 minutes with the Claimant. (Tr. 282.) Dr. Peggau noted that she was fairly dramatic and unintentionally exaggerated her symptoms and her affect. (Tr. 281.) Although the Claimant did mention shaking during the evaluation, Dr. Peggau noted that it was only her right hand and it did not appear to be physiologically based. (Tr. 281.) Claimant denied any history of hospitalizations other than having her son. (Tr. 281.) Claimant's sensorium and mental capacity were alert in consciousness and she was appropriately oriented. (Tr. 281.) Dr. Peggau further noted that the Claimant was able to understand, remember, sustain concentration and persist in tasks. (Tr. 282.) He reported that the Claimant was able to interact socially and adapt to work settings. (Tr. 282.) Dr. Peggau also indicated that Claimant's level of anxiety is fairly manageable and it may be therapeutic for her to find ongoing employment on a full-time basis. (Tr. 282.) Claimant was unable to complete the serial seven subtraction from 100. (Tr. 281.) Claimant also calculated that 4 x 6 = 18 but after being refocused she was able to calculate 2 x 4, 3 x 5,

8

and 7 x 7. (Tr. 281.) Dr. Peggau further noted that the Claimant was able to manage finances. (Tr. 281.) In his final diagnosis, Dr. Peggau found Claimant to have Anxiety Disorder, NOS with somatic features, largely exaggerated, and Major depression, Moderate. (Tr. 281.)

On March 3, 2006, Dr. Giakas stated that the Claimant's mood remained very depressed and anxious. (Tr. 289.) Claimant did not appear agitated and denied suicidal ideation. (Tr. 289.) Dr. Giakas diagnosed the Claimant with Bipolar II Disorder and Social Phobia. (Tr. 289.) On March 31, 2006, Dr. Giakas reported that the Claimant was less depressed but continued to have moderate anxiety. (Tr. 289.)

On May 2, 2006, Dr. Giakas noted that Claimant continued to have fluctuations in her level of anxiety, but complained predominantly of ongoing, chronic worry and ruminations about things that are really not worth worrying about in her own opinion. (Tr. 285.) Claimant said she was planning on mowing her lawn that day and stated that she likes to get outside the house when there is nice weather because she tends to have more difficulty and increased depression when she is stuck inside the house. (Tr. 285.)

On May 22, 2006, Zella V. Moore, RNNP, reported that the Claimant was complaining of increased anxiety, but she said she was doing okay. (Tr. 320.) Claimant continued to have ruminative thoughts and other worries. (Tr. 320.) At a follow-up evaluation on June 29, 2006, Dr. Giakas noted Claimant stated she had high levels of anxiety and depression and persisting anergia. (Tr. 321.) Claimant said she sleeps well, is not suicidal, and has no delusions or hallucinations. (Tr. 321.) On July 3, 2006, Claimant underwent a reassessment with Nurse Moore. (Tr. 321.) Nurse Moore reported that Claimant's mood was moderately depressed and irritable. (Tr. 321.) Claimant was

complaining of feeling increased anxiety, low energy, decreased sleep, decreased concentration, decreased appetite, and decreased libido. (Tr. 321.) Claimant had multiple sores on her left forearm where she had picked at her skin while she was agitated. (Tr. 321.) Claimant was instructed to discontinue Ambien CR and Abilify, reinitiate Seroquel, and decrease Paxil. (Tr. 321.)

On July 17, 2006, Nurse Moore reported that the Claimant felt much better following the medication adjustments. (Tr. 324.) Her mood continued to be mildly depressed with moderate anxiety but her affect was brighter. (Tr. 324.) Nurse Moore further noted that the Claimant's concentration and focus were greatly improved. (Tr. 324.) During the month of August, Nurse Moore reported substantially similar findings but noted that the Claimant was very concerned after recently being diagnosed with Type II Diabetes Mellitus. (Tr. 335-26.)

On September 6, 2006, Jean A. Cooper, MS, LCPC, CADC, with whom the Claimant had been participating in individual therapy since 2003, sent an email to Mr. Gesmer. (Tr. 318.) The email stated that the Claimant had made some progress in individual therapy, however a central issue has been her anxiety and her inability to seek or maintain full-time employment. (Tr. 318.) Ms. Cooper stated that the Claimant's inability to work full-time seems to create guilt which in turn increases her anxiety. (Tr. 318.) Ms. Cooper further stated that it is doubtful that she will be able to work or cope with a full-time job anytime in the near future. (Tr. 318.)

On February 8, 2007, Claimant admitted herself to the Emergency Department saying "she [was] not doing good." (Tr. 405.) Claimant stated that she felt like her head was racing all the time and her husband was harassing her and pushing her over the edge.

(Tr. 405.) Emergency Department notes state that she was thinking about hurting herself but would not because of her children. (Tr. 405.) After 4 hours and 39 minutes of observation, Claimant was stable and discharged. (Tr. 406.)

In a Medical Source Statement of mental ability to do work-related activities, completed by Nurse Moore on April 24, 2007, Nurse Moore indicated that the Claimant had no impairment related to her ability to understand, remember, and carry out short, simple instruction. (Tr. 414.) However, she noted that the Claimant had a marked impairment in her ability to understand, remember, and carry out detailed instructions. (Tr. 414.) She further noted that the Claimant had a marked impairment in her ability to make judgments on simple work-related decisions. (Tr. 414.)

Later in the Medical Source Statement, Nurse Moore indicated that the Claimant's ability to interact appropriately with supervisors and coworkers was extremely impaired. (Tr. 415.) Nurse Moore explained that the Claimant would be afraid of a supervisor or manager, viewing the person as a threat to her or her self-integrity. (Tr. 415.) The same could occur when meeting new people and the Claimant would immediately feel threatened. (Tr. 415.) Nurse Moore also noted that the Claimant had an extreme impairment in her ability to respond appropriately to pressures and changes in a usual work setting. (Tr. 415.) She further noted that the Claimant's organizational skills, cognition, and ability to care for herself would be affected by her impairment. (Tr. 415.)

That same day, Nurse Moore noted that the Claimant's mood was moderately depressed and her affect was mildly constricted. (Tr. 417.) Claimant was moderately anxious and irritable but was not suicidal and denied delusions and hallucinations. (Tr.

11

417.) In three follow-ups with Nurse Moore during the month of May, the findings were substantially similar. (Tr. 418, 420, 423.)

On May 21, 2007, the Montreal Cognitive Assessment ("MOCA") was administered by Nurse Moore. (Tr. 423.) She reported that the Claimant was very anxious prior to the exam, but calmed down with encouragement and reassurance. (Tr. 430.) The Claimant had difficulty drawing the cube and connecting the hands on the clock. (Tr. 430.) Claimant did very well on naming, memory and delayed recall, language, abstraction, and orientation. (Tr. 430.) She scored only one point in the attention category. (Tr. 430.) Claimant's total score was 22/30. (Tr. 430, 433, 435.)

On June 7, 2007, Dr. Giakas noted that the Claimant reported anxiety and panic attacks that occur about twice a week. (Tr. 424.) He stated that he was "surprised" about the MOCA examination results and further stated that if the Claimant did in fact have this degree of cognitive deficit, further evaluation needed to take place. (Tr. 424.) Upon follow-up evaluation on June 21, 2007, Dr. Giakas reported that Claimant's mood remained depressed and her energy was low. (Tr. 427.) The Claimant broke down crying while talking about her husband. (Tr. 427.) Dr. Giakas noted that this seemed to be in "stark [contradiction]" to the progress note from her psychotherapist at the last visit. (Tr. 427.) On July 5, 2007, Nurse Moore evaluated Claimant and diagnosed her with obsessive compulsive disorder ("OCD"). (Tr. 430.)

On September 7, 2007, the Claimant went through a consultative evaluation at the request of the Social Security Administration. (Tr. 445.) Dr. Kamlesh Ramchandani, M.D., reported that the Claimant's anxiety prevented her from performing activities like

12

shopping. (Tr. 450.) He further noted that Claimant's anxiety prevented her from traveling without a companion for assistance and using public transportation. (Tr. 450.)

### 2. Back

Following the supplemental hearing before the ALJ, the Claimant went through a consultative evaluation at the request of the Social Security Administration. (Tr. 443.) On September 7, 2007, Claimant underwent a 25 minute examination by Dr. Ramchandani. (Tr. 443.) In his notes, Dr. Ramchandani reported that Claimant complained of having backache for 10 years. (Tr. 443.) He noted that the pain was sharp in nature and occurred in the lumbar spine. (Tr. 443.) Claimant's pain became worse on sitting and standing for 15 minutes. Dr. Ramchandani's ultimate impression was that Claimant had arthralgia of the lumbar spine and right hip joint. (Tr. 444.)

On September 7, 2007, Dr. Ramchandani also completed a Physical Medical Source Statement of Ability to do Work-Related Activities. (Tr. 445.) In the Statement, Dr. Ramchandani noted that the Claimant could occasionally lift/carry up to 10 pounds but could never lift/carry more than 10 pounds due to her backache. (Tr. 445.) Dr. Ramchandani reported that the Claimant could sit/stand for 15 minutes at a time without interruption and could walk only 10 minutes at one time without interruption. (Tr. 446.) In an eight-hour workday, Claimant could sit/stand for 3 hours and walk for 2 hours because her backache required her to rest. (Tr. 446.) A cane was medically necessary for confidence due to Claimant's back but the Claimant could ambulate 1 block without the use of a cane. (Tr. 446.)

Dr. Ramchandani further noted that the Claimant could reach, handle, finger, and feel frequently but could push/pull only occasionally. (Tr. 447.) In assessing Claimant's

postural activities, he reported that Claimant could occasionally climb stairs and ramps, climb ladders and scaffolds, balance, stoop, kneel, crouch, and crawl. (Tr. 448.) All were limited due to Claimant's backache. (Tr. 448.) Claimant could never tolerate exposure to unprotected heights and could tolerate exposure to moving mechanical parts only occasionally. (Tr. 449.) The Claimant could frequently tolerate exposure to operating a motor vehicle, humidity and wetness, pulmonary irritants, extreme cold and heat, and vibrations. (Tr. 449.)

### 3. Diabetes and Hypertension

Dr. Kamlesh Ramchandani, M.D. reported that Claimant had suffered from hypertension since 2002. (Tr. 443.) In addition, Douglas Shumaker, O.D., reported that Claimant was diagnosed with Diabetes Mellitus in August of 2006. (Tr. 397.) On October 19, 2006, Claimant visited Rockford Gastroenterology Association for a follow-up of her Diabetes Mellitus diagnosis. (Tr. 350.) Dr. Royce noted that Claimant was noncompliant with her regimen and was experiencing excessive thirst and fatigue. (Tr. 351.) On January 19, 2007, Dr. Royce reported Claimant's diabetes and hypertension were stable. (Tr. 367.)

### 4. Cholelithiasis and Choledocholithiasis

On September 20, 2006, Claimant visited Rockford Gastroenterology Association. (Tr. 404.) Upon examination, the reported findings indicated that the Claimant had multiple echogenic shadowing calculi within the gallbladder, portions of her liver appeared hyperechoic, and the pancreatic head and body appeared mildly hyperechoic as well. (Tr. 404). The evaluation summary stated that Claimant had

Cholelithiasis[1], with diffuse fatty infiltration of the liver, but no evidence of Cholecystitis[2]. (Tr. 404.) On October 19, 2006, Claimant visited Dr. Royce for a follow-up evaluation. (Tr. 351.) Upon examination, Dr. Royce diagnosed Claimant with Choledocholithiasis[3] with chronic Cholecystitis. (Tr. 351.)

### 5. Glaucoma

On March 22, 2007, Douglas Shumaker, O.D., reported Claimant's optic nerve was showing a slight pallor and her pupil reaction appeared somewhat sluggish. (Tr. 397.) Dr. Shumaker referred Claimant to Dr. Ericson's office for evaluation of her optic nerve to determine if the pallor was attributable to blood flow changes from the diabetes. (tr. 397.) Upon referral, on April 11, 2007, Paul Hahn, O.D., diagnosed Claimant with blurred vision. (Tr. 409.) On September 7, 2007, Dr. Ramchandani reported that Claimant was diagnosed with Glaucoma in April of 2007. (Tr. 443.) However, in the Physical Medical Source Statement of Ability to do Work-Related Activities, completed by Dr. Ramchandani, he reported that none of the Claimant's impairments affected Claimant's hearing or vision. (Tr. 448.)

### 6. Mental Residual Functional Capacity Assessment

On March 10, 2006, Dr. Elizabeth Kuester, M.D., administered a mental residual functional capacity ("RFC") assessment at the request of the Social Security Administration. (Tr. 313.) Dr. Kuester first examined Claimant's "understanding and

---

[1] Cholelithiasis is the medical term for gallstone disease. Gallstones are concretions that form in the biliary tract, usually in the gallbladder. http://emedicine.medscape.com/article/175667-overview.

[2] Cholecystitis is inflammation of the gallbladder, a small organ near the liver that plays a part in digesting food. Normally, fluid called bile passes out of the gallbladder on its way to the small intestine. If the flow of bile is blocked, it builds up inside the gallbladder, causing swelling, pain, and possible infection. http://www.webmd.com/digestive-disorders/tc/cholecystitis-overview.

[3] Choledocholithiasis is the presence of at least one gallstone in the common bile duct. The stone may be made up of bile pigments or calcium and cholesterol salts. http://www.nlm.nih.gov/medlineplus/ency/article/000274.htm.

memory." (Tr. 313.) She noted that Claimant's ability to remember locations and work-like procedures, as well as her ability to understand and remember very short and simple instructions, were not significantly limited. (Tr. 313.) Claimant's ability to understand and remember detailed instructions was only moderately limited. (Tr. 313.)

Dr. Kuester then addressed Claimant's "sustained concentration and persistence." (Tr. 313.) Dr. Kuester noted that Claimant's abilities to carry out very short and simple instructions, sustain an ordinary routine without special supervision, and make simple work-related decisions were not significantly affected. (Tr. 313.) She further noted that Claimant's abilities to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances were not significantly limited. (Tr. 313.) Claimant's abilities to carry out detailed instructions, maintain attention and concentration for extended periods, and work in coordination with or proximity to others without being distracted by them were moderately limited. (Tr. 313.) Dr. Kuester also noted that Claimant's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods was moderately limited. (Tr. 314.)

Dr. Kuester also examined Claimants "social interaction." (Tr. 314.) According to Dr. Kuester's report, Claimant's ability to ask simple questions or request assistance, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness were not significantly limited. (Tr. 314.) Dr. Kuester further reported that Claimant's abilities to interact appropriately with the general public, and

accept instructions and respond appropriately to criticism from supervisors were both moderately limited. (Tr. 314.)

Dr. Kuester next examined Claimant's "adaptation" abilities. (Tr. 314.) According to her report, the Claimant was not significantly limited in her abilities to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (Tr. 314.)

**V.**     **Standard of Review**

The court may affirm, modify or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed *de novo*. *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.")

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C § 405(g); *see also Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion,* 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence.

*Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

**VI.** **Framework of Decision**

The ALJ concluded that Claimant did not meet the Act's definition "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity, (2) whether the claimant suffers from a severe impairment, (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments, (4) whether the claimant is capable of performing work which the claimant performed in the past, and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity ("RFC") and vocational factors. *See* 20 C.F.R. § 404.1520.

## VII.    Analysis

### 1.    Step One: Claimant is not currently engaged in substantial gainful activity.

In the Step One analysis, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties and is done, or intended to be done, for pay or profit. *See* 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found "not disabled" regardless of medical condition, age, education, or work experience, and the inquiry ends. If the claimant is not engaged in substantial gainful activity, the inquiry proceeds to Step Two.

Here, the ALJ determined that Claimant has not engaged in substantial gainful activity since June 30, 2003, the alleged onset date. (Tr. 86.) The Claimant has worked more recently as a caregiver for an Alzheimer patient but only worked six hours weekly and often called in "unavailable." (Tr. 86.) The ALJ determined this work to be accommodated, sheltered, and non-competitive. (Tr. 86.) Since the initial hearing, Claimant has stopped working entirely. (Tr. 87.) There is no indication that the Claimant reported earnings which she derived from these work activities as self-employment income or that wages were reported by the employer, so the ALJ inferred that this work does not involve the threshold income considered at 20 C.F.R. § 404.1574. (Tr. 87.) Neither party disputes this finding. As such, this court affirms the ALJ's Step One determination.

### 2. Step Two: Claimant Suffers From a Severe Impairment.

Step Two requires a determination whether the claimant is suffering from a severe impairment. A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. *See* 20 C.F.R. § 404.1520(c). If the claimant suffers a severe impairment, then the inquiry moves on to Step Three. If the Claimant does not suffer a severe impairment, then the claimant is found "not disabled," and the inquiry ends.

In the present case, the ALJ found that Claimant had the following severe impairments: "major depression, recurrent, moderate, with anxiety, obsessive compulsive disorder, obesity with status post August 2007 gastric bypass procedure, cholelithiasis, type II diabetes mellitus, hypertension, and status post 1995 caesarean section." (Tr. 87.) Neither party disputes this finding. As such, this court affirms the ALJ's Step Two determination.

### 3. Step Three: Claimant's impairment does not meet or medically equal an impairment in the commissioner's listing of impairments.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). The Listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from adequately performing any significant gainful activity. *See* 20 C.F.R. §§ 404.1525(a); 416.925(a). The Listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *See Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically

equivalent to a listed impairment, then the claimant is found to be disabled, and the inquiry ends. If not, the inquiry moves on to Step Four.

Here, The ALJ considered all of the applicable Medical Listings, including 12.04 (affective disorders) and 12.06 (anxiety disorders). (Tr. 90.) The Claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 or 12.06 or any other listing. (Tr. 90.)

The ALJ then considered whether the "paragraph B" criteria were satisfied. (Tr. 90.) The Paragraph B criteria require the presence of at least two of the following for a claimant to be considered disabled: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked deficiencies of concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *Larson v. Astrue*, 615 F.3d 744, 748 (7th Cir.2010) (citing 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.04(B)). Thus, satisfaction of the Paragraph B criteria requires that Claimant's mental impairments cause at least two "marked" limitations, or one "marked" limitation and "repeated" episodes of decompensation. See 20 C.F.R. § 404.1520a(c)(4). In activities of daily living, the Claimant has mild restriction. (Tr. 90.) In social functioning, the Claimant had moderate difficulties, (Tr. 90.) With regard to concentration, persistence or pace, the Claimant has moderate difficulties. (Tr. 90.) As for episodes of decompensation, the Claimant has experienced no episodes of decompensation. (Tr. 90.) Because the Claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria are not satisfied. (Tr. 90.)

The ALJ also considered "Paragraph C" criteria for chronic mental illness that are cited in Medical Listing 12.04 and 12.06. (Tr. 91.) However, the was no indication that the Claimant's mental impairments meet these criteria. (Tr. 91.) Neither party disputes the ALJ findings. As such, this court affirms the ALJ's Third Step analysis.

   **4.      Step Four: Based on Claimant's residual functional capacity, she is not capable of performing work which he has performed in the past.**

At Step Four, the Commissioner determines whether the claimant's RFC allows the claimant to return to past relevant work. RFC is a measure of the abilities which the claimant retains despite his or her impairment. *See* 20 C.F.R. § 404.1545(a), 416.945(a). The RFC assessment is based upon all of the relevant evidence, including: objective medical evidence; treatment; physicians' opinions and observations; and the claimant's own statements about his or her limitations. *See Id*. Although medical opinions bear strongly upon the determination of the RFC, they are not conclusive. The determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

"Past relevant work" is such work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. *See* 20 C.F.R. §§ 404.1565(a), 416.965(a); Social Security Ruling 82-62. If the claimant's RFC allows the claimant to return to past relevant work, the claimant will be found "not disabled" and the inquiry ends. If the claimant is unable to return to past relevant work, the inquiry proceeds to Step Five.

In the present case, before considering the Step Four analysis, the ALJ determined Claimant had the following RFC:

> "the [C]laimant retains a maximum residual functional
> capacity for sedentary work on level surfaces, subject to the
> need for cane assistance, and the need for routine,
> unskilled, repetitive work learnable on short demonstration
> or less than 30 days, not involving extended oral or written
> communication or public contact."

(Tr. 92.)

In making this determination, the ALJ asserts that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p." (Tr. 91.) The ALJ also claims to have "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Tr. 91.)

In his decision, the ALJ then summarized the medical evidence provided by the Claimant. (Tr. 16.) The court specifically notes the following from the ALJ's discussion:

- Dr. Giakas, a board-certified psychiatrist, perceived the Claimant's cognition, memory, and organizational skills as being sound. (Tr. 89.)

- The Claimant has undergone no psychiatric hospitalizations or partial day hospitalizations. (Tr. 89.)

- Claimant's caring for Alzheimer's patients throughout the majority of the period of adjudication would tend to contradict Nurse Moore's limiting of Claimant to straightforward simple tasks. Likewise, Claimant worked for ten years as a CNA in one facility, quitting once for pregnancy and the second time apparently because her mother passed away in 2004. (Tr. 89.)

- During cognitive testing, Claimant displayed adequate memory functioning and judgment and was oriented to person, place, and time. (Tr. 89.)

- Dr. Peggau observed that the Claimant related having no difficulties performing her routine daily activities of daily living and had several friends with whom she socialized regularly. (Tr. 89.)

- Dr. Peggau noted that, despite her anxiety, the Claimant was capable of understanding, remembering, and sustaining concentration, could persist in the

performance of tasks, and could interact socially and adapt to work settings. He opined that it might actually be therapeutic for the Claimant if she were to find ongoing full-time employment. (Tr. 89.)

- A DDS physician who evaluated the severity of the Claimant's mental impairment in March 2006 opined that the Claimant's affect and anxiety disorders caused no more than a mild restriction of her activities of daily living, moderate difficulties maintaining social functioning and concentration, persistence, or pace, and had not caused any episodes of decompensation. (Tr. 90.)

- Medical Expert Rozenfeld perceived strictly moderate limitations in assessing the medical record. In her judgment, it was apparent that the Claimant retained substantial coping skills and the bipolar and OCD symptoms largely were stable. She posited that the Claimant has no more than mild restriction of her activities of daily living, moderate difficulty maintaining social functioning, and moderate difficulty maintaining concentration, persistence, or pace. She reported no incidents of decompensation. (Tr. 90.)

- Post-hearing consultative internist, Dr. Ramchandani seems to infer that the Claimant remains functionally capable of performing a substantial range of restricted sedentary work. He anticipated that the Claimant could sit for three hours out of eight cumulatively, stand for three hours out of eight cumulatively, and walk two hours out of eight cumulatively. (Tr. 92.)

- On March 31, 2006, Claimant advised Dr. Giakas, her treating physician, that she planned on cutting her lawn, which necessarily would involve more than fifteen minutes of standing and walking at a time. (Tr. 92.)

- Dr. Giakas consistently referred to the Claimant's depression and anxiety in the context of moderate. (Tr. 93.)

- On November 15, 2006, Claimant advised Nurse Moore that she had tracked down the post office from whence she was receiving weekly insulting post cards and filed a complaint, which again would tend to demonstrate the ability to understand, remember, and carry out simple, if not complex instructions. (Tr. 93.)

- Claimant has a lot of non-work friends with whom she communicates regularly. (Tr. 93.)

- Claimant reads newspapers and books, giving the example of Ronald Reagan's autobiography. She has no problems understanding and following. (Tr. 93.)

- Claimant's treating doctors have indicated that her diabetes is stable. (Tr. 93.)

The ALJ then discussed the credibility of the Claimant. In doing so, the ALJ summarized the medical evidence provided by the Claimant. The court specifically notes the following from the ALJ's discussion:

- In February 2006, examining psychologist, Dr. Peggau reported that the Claimant presented as being "fairly dramatic" and unintentionally exaggerated her symptoms and her affect. (Tr. 89.)

- Dr. Peggau referenced a February 8, 2005 progress note in which the Claimant's treating physician had stated that the Claimant "seems to be exaggerating her symptomology." (Tr. 89.)

- The record does not support physical restrictions of the severity which the Claimant contends. The restrictions upon which the Claimant rests her allegation of disability largely derive from the subjective information which she provided to the consultative examiner and are not explained in the documented objective record. (Tr. 92-93.)

- No treating source has come forward to limit the Claimant's physical functioning to the degree which she asserts and the Claimant herself has indicated that the main reason she cannot work is "mental." (Tr. 93.)

- Dr. Giakas, a board-certified Diplomate of the American Board of Psychiatry, expressly declined to complete a medical assessment of work-related functioning on the Claimant's behalf. (Tr. 93.)

- Dr. Giakas consistently referred to depression and anxiety in the context of "moderate" even though the Claimant self-reported marked depression, anxiety, anhedonia, irritability, and low energy. (Tr. 93.)

- On December 13, 2005, Dr. Giakas noted that, despite having an apparent aversion to crowds, the Claimant's thoughts were well-organized and goal-directed and her memory was intact. (Tr. 93.)

- Dr. Giakas was prescribing neuroleptics and sleep medication which seemed to be effective in treating the Claimant's symptoms. (Tr. 93.)

- Claimant has asserted frequent lower extremity numbness, and reports that her feet often fall asleep. However, treating doctors have documented her express denial of these symptoms and have also indicated that her diabetes is stable. (Tr. 93.)

After considering the evidence of record, the ALJ found that "while [C]laimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, her statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not credible." (Tr. 93.)  The evidence within the medical record is consistent with the ALJ's findings, and appears to conflict with Claimant's descriptions of her limitations.

After making his RFC determination and assessing the credibility of the Claimant, the ALJ found that Claimant "is unable to perform past relevant work." (Tr. 94.) Neither party disputes this conclusion as Claimant's past relevant work was as a CNA.  CNA represents a medium semiskilled profession, which is beyond her assessed RFC. (Tr. 52.) The Court finds the ALJ's conclusion to be supported by substantial evidence in the record and therefore affirms the ALJ's Step Four determination.

### 5. Step Five: Claimant is capable of performing work existing in substantial numbers in the national economy.

At Step Five, the Commissioner must establish that the claimant's RFC allows the claimant to engage in work found in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon the VE's testimony, or by showing that the claimant's RFC, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "Grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found "not disabled." If no such work exists, the claimant will be found to be disabled.

At the initial hearing, The ALJ relied on the testimony of a VE to determine if Claimant could perform any substantial gainful work that exists in significant numbers within the national economy. *See* 20 C.F.R. 404.1569, 404.1569(a). The VE testified that given the residual functional capacity assessed by the ME, the Claimant would still be able to perform the requirements of representative occupations such as: general office clerk (2100 jobs in northern Illinois), bookkeeping clerk (2300 jobs in northern Illinois), order clerk (900 jobs in northern Illinois), Courier (750 jobs in northern Illinois), assembler (175 jobs in northern Illinois), and machine operator (200 jobs in northern Illinois). (Tr. 71-72.)

At the supplemental hearing, the ALJ relied on the testimony of a vocational expert to determine if Claimant could perform any substantial gainful work that exists in significant numbers within the national economy. (Tr. 31.) *See* 20 C.F.R. 404.1569, 404.1569(a). The VE testified that a person of Claimant's age, education, work experience, and RFC would be able to perform the requirements of representative occupations such as: bench sorter (14,220 jobs in the Rockford and Chicago area) and bench assembler (15,462 jobs in the Rockford and Chicago area). (Tr. 32.) When asked whether or not there would be any erosion of these jobs if the individual had to use a cane for balance, the VE stated that it would not because these are seated positions. (Tr. 32.) The VE then testified that generally being absent more than one day per month or twelve day per year would totally erode the availability of these positions. (Tr. 32.) The VE stated that being off task or losing concentration could be tolerated for five to ten minutes per hour, but realistically no more than five minutes. (Tr. 33.) The VE further testified that lying down will not be tolerated (Tr. 33.) Finally, the VE stated that emotional lows

where the individual is not able to respond to supervisors appropriately or cooperate with

coworkers could be tolerated on maybe one or two occasions but would not be tolerated

if it is something that is repeated. (Tr. 34.)

As evinced by the ALJ decision, the ALJ did not rely on the testimony of the VE

present at the initial hearing. When deciding whether there were jobs that exist in

significant numbers in the national economy that the Claimant could perform, the ALJ

relied on the expert testimony of the VE present at the supplemental hearing. (Tr. 95.)

The ALJ came to the conclusion that,

> "the [C]laimant retains a maximum residual functional
> capacity for sedentary work on level surfaces, subject to the
> need for can assistance, and the need for routine, unskilled,
> repetitive work learnable on short demonstration or less
> than 30 days, not involving extended oral or written
> communication or public contact."

(Tr. 92.)

When the ALJ posed a hypothetical for the VE at the supplemental hearing he stated,

> "Assume a younger person with a [high school] education,
> this work background, this skill set…And I said assume
> this person is basically limited to sedentary work on level
> work surfaces. And when I say sedentary work,…, I'm
> talking about standing and walking two hours out of eight,
> sitting six hours out of eight. Lifting and carrying no more
> than 10 pounds occasionally, five pounds frequently. I had
> said that the individual from the health standpoint of mental
> functioning probably had to have unskilled tasks of a
> routine and repetitive nature that did not involve judgment,
> interaction with other workers, public contact. And when I
> say no interaction with other workers I'm talking about
> extended oral or written communication."

(Tr. 30-31.)

As the court indicated in its Step Four analysis, there is substantial evidence in the

medical record that supports the hypothetical, which was consistent with the ALJ's RFC

determination. As a result, the VE's response, which included unskilled, sedentary occupations with an SVP of 2, provided a reliable assessment of which jobs would be appropriate for the Claimant.

Claimant argues that the ALJ did not follow SSR 00-4p and ensure the VE's testimony did not conflict with the DOT, which is his affirmative duty. Claimant cites *Prochaska v. Barnhart*, 454 F.3d 731 (7th Cir. 2006), which states that the ALJ's failure to comply with SSR 00-4p by failing to ask the VE if his testimony was consistent with the DOT requires reversal and remand. However, the Seventh Circuit has, on numerous occasions, held that the duty to inquire arises only when the conflict between the DOT and the VE testimony is "apparent." *Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008) (citing *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008)). A conflict is apparent if it is "so obvious that the ALJ should have picked up on it without any assistance." *Overman*, 546 F.3d at 463. In *Weatherbee v. Astrue*, the Seventh Circuit further found that there was no apparent conflict between the VE's testimony and the DOT when there was only a minor discrepancy between the job title given by the VE and the title listed in the DOT. *Weatherbee v. Astrue*, 649 F.3d 565, 572 (7th Cir. 2011). The Seventh Circuit held that a VE's testimony did not conflict with the DOT when the VE testimony was meant to refer to a broad category of jobs and the VE's use of the term was consistent throughout the DOT. *Id* at 571. The same Court found that the ALJ did not err in accepting the VE's estimates when the Claimant failed to establish that there were apparent conflicts between the VE's testimony and the DOT. *Id*. at 572. Furthermore, the District Court has found that occupational availability is the VE's expertise and not the court's. *Greenwood v. Barnhart*, 433 F. Supp. 2d 915, 928 (N.D. Ill. 2006).

The VE in the present case used the terms "bench assembler" and "sorter" to refer to a broad category of jobs. As noted in the parties' briefs, the VE's description of "sorter" jobs could refer to a number of titles listed in the DOT. For example, the parties list the positions of "mail sorter" and "nut sorter" as jobs that meet the ALJ hypothetical. Both meet the DOT reported by the VE. Given that there were "sorter" jobs that match the ALJ hypothetical, no conflict was apparent to the ALJ at the time of the hearing and the ALJ did not err in accepting the VE's estimates.

The VE testimony at the supplemental hearing demonstrates that jobs the Claimant can perform exist in significant numbers in the national economy. It appears to be well-established that 1,000 jobs is a significant number. *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009). Here, the VE, in response to the ALJ's hypothetical, testified that there were 29,682 jobs in the Rockford and Chicago area that the Claimant could perform. (Tr. 31-32.)

As such, this court finds that the ALJ properly determined that Claimant was capable of performing work existing in significant numbers in the national economy. The Court deferentially reviews the ALJ's factual determinations and affirms the ALJ if the decision is supported by substantial evidence in the record. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). The ALJ is not required to mention every piece of evidence but must provide an "accurate and logical bridge" between the evidence and the conclusion that the claimant is not disabled. Id. In this case, the ALJ appropriately relied on the testimony of the VE, and drew a logical bridge between that evidence and his decision. Therefore, this court affirms the ALJ's Step Five

determination.

**VIII.** **Conclusion**

In light of the foregoing reasons, the Commissioner's Motion for Summary

Judgment is granted, and Claimant's Motion for Summary Judgment is denied.

**ENTER:**

_____

**P. Michael Mahoney, Magistrate Judge**
**United States District Court**

**DATE:**_____8/13/2012_____